IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WINDMILL WELLNESS RANCH LLC AND E.A. | § § | |
| *Plaintiffs,* | § § | |
| V. | § § | Case No. 5: 23-cv-34 |
| | § § | |
| H.E.B., INC. AND H-E-B PPO PLAN, | § | |
| *Defendants.* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Windmill Wellness Ranch, LLC., ("Windmill") and E.A., an individual, plaintiffs herein, which file this Plaintiffs' Original Complaint complaining of HEB, Inc. and H-E-B PPO Plan.[1]

1.    Windmill and the Patient bring this action complaining of HEB, Inc. in its capacity as plan sponsor, plan administrator, claim administrators of the health insurance plans and/or employee welfare benefit plans in connection with  HEB's role as the sponsor, administrator and fiduciary of the health insurance and/or health plan products it offers to its employees. As grounds for the complaints and causes of action, Plaintiff would most respectfully show this Honorable Court the following:

## I.

## Parties

---

[1] E.A. is an individual who, at all times relevant to this action, was a beneficiary of the H-E-B PPO Plan and was also previously a patient of Windmill Wellness Ranch LLC. Pursuant to patient privacy laws, E.A. is identified herein by initials only. E.A. will be fully identified to the parties and to the Court, as necessary.

2.      Plaintiff, Windmill Wellness Ranch, LLC (hereinafter referred to as ("Windmill") is a Texas limited liability company with its principal place of business in Canyon Lake, Comal County, Texas.

3.      Plaintiff, E.A. is an individual and a resident of San Antonio, Texas. that is (or was) on information and belief an insured and a beneficiary of an employee welfare benefit plan established by H.E.B., Inc. to provide health care benefits to its employees, which is identified within HEB employee documents as the H-E-B PPO Plan.

4.      Defendant, H.E.B., Inc., is a domestic for-profit corporation. The required summons and this Plaintiffs' Original Complaint may be served on H.E.B., Inc. by serving its registered agent for service, Abel Martinez at 646 South Main Avenue, San Antonio, Texas 78204. For the convenience of the Court, H.E.B, Inc. will be generally referred to within this complaint as "HEB". When appropriate it may be referred to collectively with the H-E-B PPO Plan as "Defendants".

5.      Defendant, H-E-B PPO Plan is an employee welfare benefit plan that, on information and belief, was established by H.E.B., Inc. pursuant to the Employee Retirement Income Security Act of 1974, as amended. (29 U.S.C. § 1001, et seq.). The required summons and this Plaintiffs' Original Complaint may be served on H.E.B., Inc. by serving its registered agent for service, Abel Martinez at 646 South Main Avenue, San Antonio, Texas 78204.[2]   For the convenience of the Court, H-E-B PPO Plan will be

---

[2] An employee benefit plan may sue or be sued under this subchapter as an entity. Service of summons, subpoena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the

generally referred to within this complaint as the "Plan". When appropriate it may be referred to collectively with H.E.B, Inc. as "Defendants".

6.      The Secretary of Labor will be served with a copy of this Complaint by certified mail as required by 29 U.S.C. § 1132 (h).

7.      The Secretary of the Treasury will be served with a copy of this Complaint by certified mail as required by 29 U.S.C. § 1132 (h).

## II.
## Jurisdiction and Venue

8.      This case is within the subject matter jurisdiction of this Court pursuant to 29 USC §§ 1001, *et. seq.* of the Employment Retirement Income Security Act ("ERISA") and under 28 USC § 1331 (federal question jurisdiction). Venue is proper and appropriately established in this Court pursuant to 28 USC § 1391(b)(2), as the named defendant resides in this federal district is a Texas Corporation and the patient/plan beneficiary of the H-E-B PPO Plan resides in this Federal District. Further, the case defendants conduct business in the Western District, and a substantial part of the events, acts or omissions that give rise to the claims herein occurred in the Western District. Pursuant to 29 U.S.C. § 1132 (e)(2), venue is proper in the Western District of Texas.

## III.
## Introduction and Factual Background

---

preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service. (29 U.S.C § 1132(d)(1)

9.     HEB is sued herein in its capacity as Plan Sponsor as it is the sponsoring employer of the Plan.

10.     HEB is also sued herein in its capacity as Plan Administrator of the Plan. Under ERISA, the Plan Sponsor, or employer, is the Plan Administrator of an employee welfare benefit plan it establishes, unless another party is designated. The Plan Administrator is directly responsible for Plan compliance and is liable for compliance penalties—even if it has delegated the performance of its duties to another party. The Plan Administrator may amend, modify, or terminate the Plan, if this right is reserved in writing properly. The term "Plan Administrator" is a source of much confusion because it is often thought that when an employer uses a Third-Party Administrator (TPA) to administer its Plan and adjudicate claims, the TPA should be named as Plan Administrator. However, the Plan Administrator is almost always the employer, not a TPA or an insurance company.

11.     HEB is also sued herein in its capacity as the Named Fiduciary of the Plan. On information and belief, it has the authority to control and manage the operation of the Plan. The Fiduciary has the duty to operate the Plan prudently and in the best interests of its Participants.

12.     Windmill is a co-occurring inpatient and outpatient treatment center specializing in substance use disorders, trauma therapies, and mental health services that serves patients from all over the United States. Windmill is licensed by the state of Texas as a Substance Abuse Treatment Facility, whereby the facility provides residential detoxification, intensive and supportive residential services, and outpatient substance abusetreatment services. Additionally, Windmill is one of very few treatment centers that

are designated by the State of Texas as a COSPD (co-occurring psychiatric disorders) facility.

13.    In this regard, Windmill offers a full medical detoxification wing and provides continuing and co-occurring treatment and medically necessary services to residents and patients, including but not limited to detoxification, inpatient, partial inpatient and outpatient care and depending on the level of care and specific clinical needs required by each patient. Being a co-occurring treatment facility, Windmill not only provides treatment for substance abuse disorders (*i.e*., opiate, narcotics, cocaine, etc.) and behavioral  addiction, (gambling, food and eating disorders, etc.), but Windmill also provides behavioral and mental health treatment for underlying conditions, including but not limited to bi-polar disorders, major depressive disorders, PTSD, various forms of trauma, anxiety disorders and chronic pain. Thus, the facility is not just a substance abuse facility, but is also fully staffed and equipped to properly diagnosis and treat co-occurring conditions with the proper modality of therapy or medication management. Windmill is also accredited by the Joint Commission on Accreditation of Healthcare Organizations to provide behavioral and mental health services to its patients.

11.    The claims in dispute involve treatment provided to a patient that on information and belief had a health benefit plan and/or employer plan sponsored by HEB at the times the services were provided.

12.    The purpose of the health benefit plan (hereinafter referred to as "the Plan") is to provide for access to health care services and to provide payment of necessary medical

expenses.

## IV.

## <u>Verification of Benefits and Authorizations to Provide Services</u>

13.    At all times relevant hereto, Windmill was not contracted via a preferred provider agreement or network agreement with the HEB plan or the third-party administrator for the plan.  As a result, services provided to the patient that received care at Windmill, the claims for made the basis of this lawsuit, are considered out-of-network. The third-party administrator of the plan is on information and belief, Blue Cross Blue Shield of Texas ("BCBSTX").

14.    For this reason, it is the routine and customary business practice of Windmill to contact the plan or the plan's third-party administrator (or any other health insurance company) prior to, or upon a prospective patient presenting to the facility seeking treatment for substance abuse, addiction, or mental disorders. Often, these patients present in urgent conditions and are in immediate need of care. For each prospective patient that identifies themselves as a member, Windmill personnel calls or contacts the plan and/or its third-party administrator and agent to confirm with certainty whether the patient has benefits and also has out of network benefits available for the services being sought, what categories of medical services are covered, and the extent of that coverage. Windmill also inquires about  precertification requirements and sought preauthorization for the services, if required.  Windmill provides Patients differing levels of care, from Detoxification (DTX), Residential Treatment (RTC), Partial Hospitalization (PHP) and

Intensive Outpatient Program (IOP) care depending on their condition, diagnosis and medical needs.  Thus, representatives contacted the utilization review agents for the HEB Plan in this case and obtained pre-authorization for the services provided to the patients and also contacted representatives of the Plan Supervisor and Third-Party Administrator for the HEB Plan and verified each patient's enrollment and group health plan coverage under the HEB Plan.

15.     At all times relevant here and on information and belief, Blue Cross Blue Shield of Texas ("BCBSTX") acted as the third-party administrator of the Plan and was at all times acting as the actual or ostensible agent of the Plan.

16.     Prior to admitting a patient to its facility, Windmill inquires specifically about the rates that will be paid for its services by a plan or insurer. Windmill asks the plan or third-party administrator of the plan whether it will pay its Usual and Customary Rates ("UCR") for out of network benefits and services.  If not, Windmill  specifically requests a description of the benefits available under a given patient's health insurance policy or employee welfare benefit plan to determine the method and measure of reimbursement it can expect to be paid, and at least attempts to gauge some measure of calculating the patient's financial liability.  BCBSTX provides varying statements and representations as to reimbursement rates for medical care providers. In practice, BCBSTX adheres to intentionally vague terminology and never discloses a dollar figure or even a range of monetary sums in response to the question of what will be paid for a given item, service or supply at a medical care facility. Most often, BCBSTX personnel

simply recite that the Plan pays usual and customary rates, an allowable amount or some percentage of the Medicare fee schedule. BCBSTX will sometimes respond that they do not know what the Plan pays for specific items, services or supplies.

17.     For the claims made the basis of this suit, BCBSTX, acting as the third-party administrator of the Plan, represented to Windmill that the Plan would pay a percentage of the Medicare rate.  When asked what percentage of what rate, BCBSTX responded that they did not have that information. Absent agreed reimbursement rates under a contract, usual and customary rates often serve as the basis for paying out of network benefits.  The  Centers  for Medicare Services (CMS) has defined UCR as: "the amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar services" or in other words, the providers' charges for the services.  As will be further demonstrated to the Court, the reimbursement to Windmill by the Plan to date has fallen well short of UCR, or any other commercially reasonable criteria. Often, Preferred Provider Organization plans (PPOs) are more costly to the employee, as those plans typically provide those members greater access to out of network providers, as well as better coverage and benefits.  How out of network providers are reimbursed under benefit plans is important to the plan beneficiary, as they are responsible for the difference between the usual and customary charges and what the plan reimburses for out of network services. Inappropriate underpayment to providers leads to plan beneficiaries being responsible for the balance of the UCR charges and the patient and provider then bear the burden of that difference, unless properly paid by the plan or insurer.

17.    For other claims, the Plan or BCBSTX, has sometimes represented that the plan would pay the "allowable amount", which is never defined and intentionally vague. At other times, it is represented that the plan would pay a Medicare allowable or a percentage of the Medicare allowable, as in this case. The Plan apparently alleges that some sort of Medicare-based reimbursement methodology or an "allowable amount" is being applied for the services provided to its members in determining the payment rates under the plan.  This description is vague and illusory, as there are no established Medicare rates for the level of care and types of services that are provided at Windmill.  Medicare does not provide a rate for an inpatient residential treatment center, or the level of care provided by Windmill; however, service codes for very similar services do exist that are used by Medicare. When service codes for Windmill's services are itemized and reimbursement for each code is calculated, the reimbursement by Medicare for those services and codes far exceeds the amount  paid to date by the Plan. However, neither HEB nor the Plan, has been willing to disclose the true rationale and methodology for the reimbursement calculations used for E.A.'s claims associated with the services received at Windmill.  In addition to other relief, E.A. and Windmill seek full disclosure of all factors utilized, in whole or in part, by HEB, the Plan and its TPA in calculating and making reimbursement to Windmill in connection with E.A.'s claims.

18.    To further demonstrate these facts, FAIR Health rates for the same and/or similar services far exceed the amounts paid by the Plan to date.  FAIR Health is an independent, not for profit organization that provides information about healthcare costs with health insurers providing over a billion healthcare bills, which are added to FAIR

Health's database of more than 34 billion claims.  FAIR health compiles that data and information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients all across the country including specific geographic regions.  That information is publicly available to consumers, researchers, businesses, etc. Many states including Texas look to FAIR Health data for consumer protection.  The Texas Department of Insurance announced it would be utilizing FAIR Health Data for determining appropriate reimbursement for out of network surprise billing disputes.  FAIR health benchmarks show that the Plan has substantially underpaid for the services provided to E.A. As an example, Windmill's charges for the detoxification level of care are $4,800 per day. FAIR Health data indicates the usual and customary payment by most plans at the *80% percentile of usual and customary* for detoxification in the Central Texas region to be $3,913.00.  Windmill's charges for residential care are $4,200 per day. FAIR Health data indicates that the usual and customary allowable amount at the 80th percentile to be $3,425.00 for the same services.  For partial hospitalization, Windmill charges $2,275.00 per day. FAIR Health data indicates that the 80th percentile of usual and customary payment to be $1,898.00 for this category of services.  The disparity in reimbursement for the same levels of care and the exact same services cannot be justified.  E.A.  and Windmill contend that the Plan's "allowable" reimbursement rates and levels of reimbursement lack objectively verifiable criteria to make them commercially reasonable, and subject E.A. to far greater liability than should be the case under the Plan. The Plan or its TPA applied unusually low rates of reimbursement in the adjudication of E.A.'s claims for services received at Windmill. This constitutes an improper shifting the costs of care to the E.A.,

the plan beneficiary, who is ultimately responsible for the costs of their own medical care. .

## Windmill Secured Assignments
## and Power of Substitution from its Patients

19.    For the patient, whose admission is made the basis of this lawsuit, the patient that was admitted to Windmill and executed a set of documents that included: (1) an assignment of benefits and; (2) a document appointing Windmill as the patient's authorized personal representative to take all actions necessary to pursue administrative appeals and/or legal actions on behalf of the patient. The Assignments and Authorizations to Appeal expressly authorize that Windmill is authorized to pursue legal remedies on behalf of the member/patient. The documents provide, *inter alia,* as follows:

> *"I hereby voluntarily designate, authorize, and convey Windmill Wellness Ranch and its representatives, to the full extent permissible by law, to be my personal authorized representative regarding all rights and claims related to any services provided at this facility, which authorizes Windmill Wellness Ranch to:(1) submit any and all appeals when any entity denied me a benefit to which I am entitled***;(2) act on my behalf in connection with any claim, right, or cause of action that may arise under my plan; (3) act on my behalf to pursue such claim, right, or cause of action in connection with said plan including, but not limited to, the right and ability to act asmy authorized representative, with respect to a benefit plan governed by the provisions of ERISA as provided in 29 C.F.R.2560.503-1(b);" (emphasis added)***

20.    The patient/member made the basis of this dispute executed such assignments and authorizations for Windmill to act on their behalf and each entity verified that that member had available out of network benefits for the care to be provided.

Windmill therefore has the right and appropriate standing to pursue plan benefits not only as the assignee of the plan participant under ERISA, but also as the appointed personal and legal representative of the patient/member. Thus, Windmill is authorized and legally appointed to bring the claims asserted in this lawsuit in the name of and as the actual patient/member. It is also authorized to assert its interest to reimbursement as assignee of E.A., the employee and beneficiary of the Plan. Thus, E.A. is seeking to recover appropriate payment under the Plan for services provided to E.A. by Windmill. These redacted assignments and authorizations to appeal, as described above are attached as Exhibit "A" and Exhibit "B".

**VI.**

**Submission of the Claims and Underpayments**

21.    For each of the claims made the basis of this dispute, the Plan, its administrator and/or its actual agent, represented that the patient had coverage under the plan, and the proposed services were authorized. E.A. and Windmill relied on these various representations in agreeing on a plan of care and admitting E.A. to its facility to receive medical care. As communicated to E.A. and Windmill, this created an expectation of reasonable reimbursement; however, it is now apparent to plaintiffs that these payment standards are meaningless terms to the Plan and its TPA. According to the Plan's Explanations of Benefits, (issued by BCBSTX as its TPA), "usual and customary", "allowable amount" and/or Medicare rates were not and never were the basis for the reimbursement tendered. The rationale and methodology employed by the Plan and its

TPA in connection with the claims for E.A.'s medical care are unknown and cannot be derived by reading any document that the Plan or its TPA has supplied to E.A.

22.    As customary in the industry and after services were provided to E.A, Windmill submitted its claims to the Plan's TPA. However, the claims in dispute have either not been paid at all, or they were grossly underpaid with vague explanation at best. All, or almost all the Explanation of Benefits (EOBs) received by Windmill from the plan or its TPA contain ambiguous terms, such as:

> "Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payments and contract reductions) that have resulted from the prior payer (s) adjudication"

23.    Thus, some EOBs reference or infer that the claims are being processed in accordance with a contract with Windmill and that the patient cannot be billed, even though Windmill is not contracted with the Plan or its TPA, which is BCBSTX. The EOBs provide no specificity and make no reference to any reimbursement standards or methodology. Thus, there is a lack of disclosure that has had a significant impact on the beneficiary, E.A., which continues to adversely impact E.A. at this time. In addition to relief in the form of health care benefits, E.A. seeks full disclosure of all factors utilized, in whole or in part, by HEB, the Plan and its TPA in calculating and making reimbursement to Windmill in connection with E.A.'s claims.

**VII.**

**Requests from Patient and Windmill for Plan Documents Ignored**

24.     The actual methodologies underlying the Plan's and its TPA's reimbursement methodologies are not readily ascertainable to E.A. and are not likely known to HEB, even though it is the sponsor of the Plan and the Plan Administrator. The reimbursement methodologies of the Plan have never been disclosed to E.A. or Windmill. The Plan or its TPA may consider its reimbursement methodologies to be proprietary in nature. However, as an entity with authority over ERISA plan assets, the Plan is required to produce health plan documents and policies it issues to employers, as well as to the beneficiaries of those plans. In the event the Plan Sponsor and Plan Administrator have given the TPA authority to adjudicate claims on its behalf, then the TPA is required to make appropriate disclosures to beneficiaries of the Plan, including its reimbursement methodologies. This is required by ERISA regulations promulgated by the U.S. Department of Labor, found at Title 29 of the C.F.R. Some of the required plan disclosures are descriptions are required to contain the following:

a.     Cost-sharing provisions, including premium, deductible, co-insurance and co-payment amounts for which the participant orbeneficiary will be responsible.

b.     The extent to which preventive services are covered under the plan.

c.     Whether, and under what circumstances, existing and new drugs are covered under the plan.

d.     Whether, and under what circumstances, coverage is provided formedical tests, devices and procedures.

e.     Provisions governing the use of network providers; the composition of provider networks; and whether, and under what

circumstances, coverage is provided for out-of-network services.

f.    Provisions requiring pre-authorizations or utilization review as a condition to obtaining a benefit or service under the plan.

29 CFR § 2520.102-3 (Emphasis added).

25.    Windmill routinely requests plan documents to assist its patients in determining plan benefits, as patients and family members are often interested in the actual language of their plan and its terms for coverage of behavioral health. Windmill also regularly has patients request copies of their own plan documents during their treatment, so they can fully understand the benefits available under the plan, what the plan will provide and what the patient's financial responsibility will be. Substantially all such efforts by Windmill and its patients prove futile and the requests are ignored by the Plan Administrator and/or the TPA.

26.    Windmill has also requested clinical standards, guidelines, methodologies and reimbursement rates to determine whether the requirements of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) are being observed. The Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act") and the equivalent Texas statutes found at the Texas Insurance Code, Section 1355.004 and 1368.002 ("Parity Acts") provide that mental health and substance use disorders must be provided at the same level of benefits provided for physical illnesses. Fully funded plans or fully insured plans are required to provide parity. Likewise, self-funded plan reimburses medical care providers from assets of the group plan that provides coverage for substance use disorders and mental health. In this regard, plans and

insurance carriers are prohibited by state and federal law from denying coverage for medically necessary services or to otherwise apply quantitative or non-quantitative restrictions or limitations on coverage of medically necessary medical services relating to substance abuse and mental health services.

27.    The Plan named herein, uses the services of BCBSTX as its TPA (third-party administrator). This TPA has refused to make disclosures about its practices, even when authorized in writing by the plan beneficiaries. Without such disclosures, it is impossible to  ascertain compliance with any applicable Parity Acts, state or federal.

28.    For the services provided to E.A. at Windmill, the usual and customary charges for the services provided were $354,800.00.  To date, reimbursement by the Plan has been limited to $40,365.17, or less than 16 percent of Plaintiff's usual and customary charges.  E.A. contends that the sum tendered for services provided by Windmill is an substantially less than is appropriate amount payable under the Plan, improperly shifting larger debt than it should be to E.A.

## VIII.

## ERISA-GOVERNED PLANS:
## APPLICATION OF THE MENTAL HEALTH PARITY AND
## ADDICTION EQUITYACT OF 2008 AND TEXAS LAW REQUIREMENTS

29.    E.A. asserts that the Plan which was intended to provide coverage of the behavioral health services in question was a plan established by HEB pursuant to ERISA and therefore regulated by the Employee Retirement Income Security Act of 1974

("ERISA") and the promulgated regulations thereunder at Title 29 of the Code of Federal Regulations.  Thus, the Plan is required to comply with the The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) , *i.e.*, the "Parity Act" and/or the equivalent Texas statutes found at the Texas Insurance Code, Section 1355.001 *et. seq*. and 1368.001 *et. seq.* ("Texas Parity Act").   In general, the Parity Act requires that mental health and substance abused disorder ("MH/SUD") benefits are administered in a way no more restrictive than benefits for medical and surgical treatment. The analysis comparing how benefits are administered is separated into "quantitative" treatment limitations (QTLs) and "nonquantitative" treatment limitations (NQTLs). Examples of QTLs include: (1) financial restrictions, such as separate deductibles or different copays for MH/SUD treatment; and (2) quantifiable treatment limitations, such as annual or aggregate visit limits. The Parity Act requires that health plans eliminate quantitative treatment limitations ("QTLs") if the plan does not impose similar limits on medical and surgical benefits. Plans must also ensure parity among non-quantitative treatment limitations ("NQTLs"), which include managed care practices such as medical necessity determination, formulary design for prescription drugs, provider network adequacy, and utilization review procedures. In the case of NQTLs, the plan must ensure that the NQTLs applicable to MH/SUD benefits "are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."

　　30.    The Parity Act has undergone several changes since it passed in 2008. First,

the Affordable Care Act (ACA) expanded parity coverage and required all plans offered in the individual health insurance market and the ACA's health insurance exchanges to comply with federal parity requirements. The 21st Century Cures Act then amended the Parity Act to require the Tri-Agencies to convene a public meeting of stakeholders, to develop compliance program documents, and to issue guidance on disclosure requirements so consumers can access information about their MH/SUD benefits. The Parity Act was also amended in December 2020, through the Consolidated Appropriations Act of 2021, which required health plans to make information available to regulators regarding any NQTLs used in their plan design. The Act requires any group health plan that "provides both medical and surgical benefits and mental health or substance use disorder benefits… shall ensure that:

> (i)     the financial requirements applicable to such mental health or substance use disorder benefits are not more restrictive than the predominant financial requirements applied to substantially all medical and surgical benefits covered by the plan (or coverage), and there are no separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits; and

> (ii)     the treatment limitations applicable to such mental health or substance use disorder benefits are not more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plans or coverage), and there are no separate treatment limitations that are applicable  only with respect to mental health or substance use disorder benefits."

31.     In defining the Parity Act requirements, the relevant federal agencies have explained that it is impermissible to impose more restrictive quantitative limitations on mental health coverage than for medical or surgical services. It is also

impermissible for those administering plans to "impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. § 2590.172(c)(4)(i). The final administrative rules governing the Parity Act describe and proscribe certain conduct by health plans. "Nonquantitative treatment limitations" ("NQTLs"), "which are limits on the scope or duration of treatment that are not expressed numerically," and provide an "illustrative list" of NQTLs which are subject to the Federal Parity Act requirements. This non-exhaustive list includes "methods for determining usual, customary and reasonable charges", which would include the methods by which BCBS determines usual and customary rates or determining allowed amounts or eligible expenses for out of network services. *See* 78 Fed. Reg. 68239-96 ("Final Parity Act Rule"). Thus, if an insurer provides both medical and surgical benefits and mental health or substance use disorder benefits, the insurer must ensure that both the financial requirements and the treatment limitations applicable to the mental health and substance use disorder benefits are no more restrictive than the predominant financial requirements and treatment limitations that apply to medical and surgical benefits. The Parity Act denies the terms

"financial requirement to include deductibles, copayments, coinsurance and  out  of pocket  expenses. 29 U.S.C. §1185a(3)(B)(i). Treatment limitation is defined to  include "limits  on  the  frequency  of  treatment,  number  visits,  and  days  of  coverage,  or  other similar  limits  on  the  scope  or  duration  of  treatment. *Id*. §1185(a)(3)(B)(iii). The regulations further provide there are two types of treatment limitations that may run afoul of  the  statute's  prohibition:  1)  Quantitative  (QTL)-  that  are  expressed numerically, such as 50 visits per year; and 2) Nonquantitative (NQTL) – which otherwise limit the scope or duration of benefits for treatment under a plan.

32.     E.A. would further show that the American Society of Addiction Medicine ("ASAM")  has  developed  nationally  and  clinically  recognized  criteria  for  addiction treatment guidelines and coverage. ASAM establishes and publishes these treatment and coverage  guidelines,  which  are  uniformly  accepted  by  clinicians  and  providers  for addiction, substance related disorders, mental health and co-occurring conditions for all levels of care.   The Texas Insurance Code and the Texas Administrative Code also set forth treatment guidelines relating to chemical dependency treatment centers that closely follow  ASAM  clinical  guidelines.  See  §3.8001  *et. seq*.  As  an  example,  the  Texas Administrative  Code  provides  that  the  recommended  length  of  stay  for   inpatient detoxification services is up to 14 days (§3.8010), the recommended length of stay for inpatient rehab/treatment is 14 to 35 days (§3.8014) and the recommended length of stay for partial hospitalization services is between 4-35 days. Section 1355.004 provides that plans must provide coverage, based on medical necessity, for not less than 45 days of inpatient treatment for the treatment of serious mental illness in each calendar year.

33.    Although the Plan may assert that their guidelines and clinical policies are consistent with accepted standards of care when adjudicating claims, this is not likely true. E.A. asserts that the Plan and its TPA are charged with the obligation to comply with federal and state parity laws; however, they attempt to avoid compliance through non-disclosure. E.A. asserts that the Plan, with the assistance of its TPA, inconsistently employs arbitrary and capricious criteria in connection with behavioral health services. Accordingly, the extent of coverage for mental health and substance abuse care, as well as E.A.'s ultimate financial responsibility, remain unresolved as to E.A.'s claims at issue in this lawsuit.

34.    The utilization criteria of the Plan do not conform to the standard of care required to properly treat those diagnosed with a behavioral health condition. On information and belief, the Plan, through and with the assistance of its TPA, authorizes less care and lower levels of care for detoxification, partial hospitalization, residential care or intensive outpatient care than are required to meet established clinical guidelines.

35.    Likewise, the Plan's levels of reimbursement for out-of-network services have resulted in an improper shifting of higher out of pocket expenses to E.A. for behavioral health treatment. E.A. contends this is in violation of the Act. E.A. further contends that these improper practices result in a more restrictive financial requirement than the Plan imposes for corresponding medical and/or /surgical benefits ─ just the opposite of parity. The Plan's adjudication of E.A.'s claims constitutes a violation of the Federal Parity Act as an impermissible, nonquantitative methodology that is financially

restrictive. Likewise, denial of extended coverage and care and benefits for necessary treatment is an impermissible quantitative restriction.

36.    E.A. and Windmill are further informed and assert that BCBSTX acts as an agent of the Plan and/or may function as a *de facto* Plan Administrators, or as a co-administrator because, *inter alia*, BCBSTX issues policies and/or plan documents of some type to participants, receives benefit claims, evaluates and processes those claims, makes benefit determinations, makes and administers benefit payments, and processes appeals of benefit determinations. Moreover, E.A. and Windmill assert that that, even with respect to self-funded ERISA plans, which have not specifically designated a Plan Administrator, the Plan's TPA has been designated as the claim administrator of the Plan and has been delegated the responsibilities described above. With respect to E.A.'s claims at issue herein, E.A. asserts that BCBSTX, acting as the actual or ostensible agent and/or third-party administrator of the Plan:

a)    drafted and provided plan members with plan documents;

b)    operated a centralized verification and authorization telephone number which handled calls for members of the self-funded plans, including plans that have not yet been joined as defendants in this action;

c)    authorized Windmill to provide medical services to beneficiaries of the ERISA plans.

d)    received and processed electronic bills from Windmill for claims for members of the self-funded plans, including plans that are not yet joined as defendants in this action;

e)    communicated with Windmill on behalf of the ERISA plans (and additional self-insured plans that are not named as defendants) regarding authorization of specific behavioral

health treatment protocols;

f)      issued remittance advices and EOBs;

g)      priced claims for the self-insured ERISA plans;

h)      communicated with Windmill with respect to the processing of claims on behalf of the self-insured plans;

i)      processed and adjudicated appeals, and sent appeal response letters; and

j)      issued payments.

## IX.

## ALLEGATIONS COMMON TO ALL CLAIMS OF WINDMILL AND PATIENT

37.     It is standard in the health care industry that when medical care facilities, such as Windmill, enter into written contracts with a health insurer that also operates as a managed care organization and plan administrator for both private sector and governmental entities, such as the Plan, the medical facility agrees to accept reimbursement that is discounted from the its billed charges in exchange for the benefits of being a "contracted provider" (*i.e.*, a provider with a written contract with the plan). These benefits include an increased volume of business because the health plan provides financial and other incentives for its members to receive their medical care at the contracted provider, such as advertising that the provider is "in-network," and allowing the members to pay lower co-payments and deductibles to use the contracted provider.

38.     Conversely, when medical facilities such as Windmill, do not have a written contract with a health insurance company/managed care organization, the facility

receives less business from the insurance company administering health plans, as the health plan discourages its members from receiving their medical care from out-of-network providers. Because, in such circumstances, the health plan is discouraging its members from receiving their care at the non-contracted facility, the non-contracted facility has no obligation to reduce its charges and is entitled to receive payment based on their usual and customary charges for the services rendered. Although out of network benefits are almost always less generous to the plan member than in-network benefits, the health plan is not entitled to a discount from a medical care provider's billed charge, as the provider is receiving none of the benefits of that are associated with being an in-network provider, *i.e.*, steerage of business to the provider.  This is particularly true as to Windmill as it is licensed as a co-occurring specialized treatment facility that provides a level of care and range of services that are not available elsewhere in  its geographic region.

39.     In the immediate non-contracted situation, the Plan has inappropriately underpaid Windmill for medically necessary services provided to E.A., a Plan beneficiary of HEB's employer-sponsored plan.  The Plan, with the assistance of its TPA, utilizes and employs baseless or flawed methodologies which result in arbitrary and unsubstantiated restrictions for behavioral health services sought and received by beneficiaries of the Plan.

40.     E.A. asserts that the Plan's systems for reimbursements for out-of-network claims are intentionally manipulated to result in inappropriately low sums of reimbursement for the claims of its beneficiaries that choose to receive services from Windmill and/or similar facilities.  Industry data supports this contention when comparing

the reimbursement rates employed by the Plan to industry-wide, publicly available data regarding mental health and substance abuse services.

41.    For all claims at issue in this action, Windmill provided behavioral health and substance abuse treatment services to the insured and beneficiary of the Plan.

42.    For all of E.A.'s claims at issue in this action, once E.A.'s health plan was identified by Windmill, Windmill confirmed that E.A. was an eligible member of the Plan by contacting the respective Plan by telephone, facsimile or via the Internet.

43.    Before E.A. was admitted, Windmill contacted the Plan or the plans agent or TPA so that E.A and Windmill are informed and have some reasonable certainty that the applicable Plan will provide coverage for the patient.

44.    E.A. contends that at all times relevant to this action, Windmill's charges were usual, customary and reasonable for the service rendered at the time and place they were rendered.

## X.
## ERISA CLAIMS

45.    Individuals and enrolled dependents who receive their health insurance through a private sector, employer-based benefit plan are generally defined as participants or beneficiaries of plans governed by the federal Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. 29 U.S.C. § 1001 *et seq*.  These "ERISA plans" are sometimes fully insured by health insurers, while in other cases the plan is self-funded, and a third, frequently used plan deign is to self-fund to a specific "attachment point", which is the dollar threshold at which excess loss insurance will indemnify the plan.  In all cases,

the plan remains financially responsible for the claims arising from that plan.

46.    E.A. and Windmill are informed and believe that HEB is the plan administrator of the H-E-B PPO Plan, and the named fiduciary for the ERISA Plan in which E.A. was enrolled at the time of admission at Windmill. HEB asserts direct control over the decision whether to prospectively approve mental health or substance abuse treatment to members of the Plan. Likewise, HEB ultimately determines whether to pay or deny a claim for services rendered by a medical care provider to a member of the Plan. Then afterward, reimbursement is determined by the Plan and/or its TPA, including the act of determining the amount that the plan beneficiary, (E.A. in this case), would be required responsible to pay for their portion of their medical care expenses.

47.    Upon information and belief, with respect to the Plan, the sponsoring employer's plan and/or the third-party administrator acting as an agent of the plan, perform administrative and other key responsibilities such as (a) certifying or authorizing Windmill's provision of services to E.A.; (b) receiving E.A's claims; (c) pricing the claims; (d) processing and administering the claims and appeals; (e) approving or denying the claims; (f) deciding whether or not to transfer the members to other in-network facilities; (g) directing whether and how to pay the claims; (h) issuing remittance advices and explanations of benefits; (i) communicating with E.A. and/or Windmill regarding the claims and services; (j) communicating with E.A. regarding the claims and services; and (k) in almost all instances, issuing a claim payment or a claim denial.

48.     On information and belief, HEB functions as an ERISA plan administrator with respect to those claims upon which it has exercised delegated authority to provide plan documents to participants and beneficiaries, receive benefit claims, evaluate and process those claims, review the terms of the plan, make initial benefit determinations, make and administer benefit payments, handle appeals of benefit determinations, and serve as the primary point of contact for members and providers to communicate regarding benefits and benefit determinations. In carrying out these ERISA plan administrator functions, HEB possesses authority and fiduciary discretion to manage and administer the Plan. At all times relevant to this action, the TPA of the Plan was acting as the agent of each of HEB's insured and/or self-funded employee health pans and had entered into express agreements with BCBSTX and/or its parent company and/or affiliated entities to act as the third-party administrator on the Plan's behalf, a n d to provide administrative services relating to the HEB employer-sponsored health plan established under ERISA. As such, BCBSTX was acting as agent for its principal, HEB, with actual or apparent authority to transact business with third parties, including Windmill, in turn making HEB either contractually or vicariously liable for the acts and/or omissions of its agent.

49.     Employee Welfare Benefit Plans established pursuant to ERISA, whether fully insured or self-funded, typically contain provisions addressing non-contracted physicians, hospitals and other categories of medical care providers at the usual, customary and reasonable rate, ("UCR"). The language and acronyms vary somewhat

from plan to plan, and may bedescribed as the "Usual, Customary and Reasonable" rate, the "Reasonable andCustomary" amount, the "Usual and Customary" amount, the "Reasonable Charge," the"Prevailing Rate," the "Usual Fee," the "Competitive Fee," or someother similar phrase. In the context of the healthcare industry, these phrases are all synonymous with usual and customary rate. Upon information and belief, no provisions in the Plan applicable to E.A. dictated the rate of reimbursement employed  by the Plan as to E.A.'s claims.

50.     The formal mechanism for a health plan or plan administrator to  explain why a claim is denied (meaning that the allowed amount is anything less than full billed charges) is an explanation of benefits ("EOB"). Defendants were required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), they were required to:

> provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv).The notification shall set forth, in a manner calculated tobe understood by the claimant –
>
> > (i)     The specific reason or reasons for the adverse determination;
> >
> > (ii)    Reference to the specific plan provisions on whichthe determination is based;
> >
> > (iii)   A description of any additional material or information necessary for the claimant to perfect the claimand an explanation of why such material or information isnecessary;

(iv)    A description of the plan's review procedures and the time limits applicable to such procedures, including astatement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v)     In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits.

(A)    If an internal rule, guideline, protocol, orother similar criterion was relied upon in makingthe adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule,guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or,

(B)    If  the  adverse  benefit  determination  is  based  on  a  medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(C)    In the case of anadverse benefit determination by a group health plan concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

51.     The Plan has never previously contended that they denied or reduced reimbursement to Windmill on the basis that Windmill had not obtained a proper assignment of benefits, or that Windmill was not otherwise a valid assignee of the plan

beneficiary. Likewise, the Plan has never previously contended that E.A. had not appointed Windmill as their authorized representative, as is E.A.'s right under federal law.

52.    Windmill's charges are usual, customary and reasonable under the legal standards applicable in Texas to defining "reasonable and customary" or "fair market value".

53.    After Windmill provided medical care to E.A., a beneficiary of the Plan, Windmill submitted E.A.'s claims to be processed for payment.

54.    E.A. alleges that the Plan has failed to reimburse Windmill properly and according to the express provisions of the Plan.  E.A. further alleges that she and Windmill are entitled to recovery of the difference between the payment it received and the amount due per the terms of the Plan. If Windmill is reimbursed a lesser sum than is proper, this increases the financial liability to E.A.

55.    As the authorized representative of E.A., Windmill has appealed and exhausted the administrative remedies as a condition precedent to bringing the claims in this lawsuit.  The Plan's business practices, as delegated through its TPA, have prevented E.A. and Windmill from access to any meaningful appeal process, including the ability to seek disclosure of information utilized, in whole or in part, by HEB, the Plan and its TPA in calculating and benefits available in connection with E.A.'s claims. If full exhaustion under any certain plan provision(s) may not have been fully completed, such completion or "exhaustion" is excused because the appeal process was not followed by the Plan and would therefore have been futile. An objective review of the history of the administrative appeals submitted to the Plan and/or its designated TPA for E.A.'s claims will reflect that

the Plan has not agreed to modify its original coverage decision(s) on any of the claims of E.A. for healthcare services rendered by Windmill.    Because E.A. and Windmill participated in these processes to the degree possible without the benefit of plan documents, E.A. and Windmill allege that the administrative records will also reflect a lack of compliance with plan administration requirements found in the regulations of the Department of Labor for ERISA-governed health plans, as well as a lack of compliance with federal and/or state Parity Laws.

## XI.
## Inaccuracies and Misrepresentations in Information Provided to Windmill

56.    E.A. elected to receive treatment from Windmill, which is an out-of-network provider as to BCBSTX, which appears to control the Plan. The Plan represented in written communications to Windmill, including through remittance advices and explanation of benefit forms ("EOBs"), that the Plan was not required to pay charges submitted by Windmill based on the terms of an employer-sponsored health benefit plan; however, none of those communiqués stated with specificity any plan provisions applicable to out-of-network claims in EOBs issued to Windmill on behalf of E.A.

57.    Many, if not most explanation of benefit forms ("EOBs") that E.A. and/or Windmill received from the Plan in connection with E.A.'s claims  repeatedly contained the following boiler plate language:

> "Charge    exceeds    fee    schedule/maximum    allowable    or
> contracted/legislated  fee  arrangement.  Note:  This  adjustment
> amount cannot equal the total service or claim charge amount; and

<u>must not duplicate provider adjustment amounts (payments and
contractual reductions</u>) that have resulted from prior payer(s)
adjudication."

These statements made to E.A. and Windmill were inaccurate because Windmill was neither a contracted provider, nor providing services for which any contracted rates or legislated fee arrangements would apply. The Plan knew, or should have known, that Windmill was not in privity of contract with the Plan or its TPA, which is BCBSTX. Therefore, the Plan knew, or should have known that such representations to E.A. and/or Windmill were not true. E.A. and Windmill assert that the Plan or its TPA, acting with full authority as the Plan's agent, knowingly made these representations in written correspondence to mislead E.A. and Windmill.

## XII.
## COUNT ONE:
## Claim for Civil Enforcement Under 29 U.S.C. § 1132(a)(1)(B):
## <u>Failure to Provide Plan Benefits</u>

58.     E.A. and Windmill incorporate all statements and averments set forth in the above paragraph one (1) through fifty-seven (57) above by reference, as if fully set forth here verbatim.

59.     E.A. and Windmill alleges this claim for relief in connection with claims for treatment rendered to E.A., who was at all time relevant to this action, and enrolled beneficiary of the Plan. This is a claim to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).

60.     E.A. has standing to pursue these claims as a beneficiary of the Plan. Windmill has standing to assert its assignment of benefits and to assert claims, not derivative of any assignment from E.A. or any other person.

61.     E.A. and Windmill allege that benefits are owed to them under the Plan. E.A. has duly authorized and appointed Windmill to act as their legal representative to bring such claims, causes of action and to seek legal redress on their behalf.

62.     The formal mechanism for a health plan or plan administrator to  explain why a claim is denied (meaning that the allowed amount is anything less than the charges billed for the services provided) is an explanation of benefits ("EOB"). Defendant was required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), it was required to provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1I(1)(i), (iii), and (iv).  The notification shall set forth, in a manner calculated tobe understood by the claimant:

(i)     The specific reason or reasons for the adverse determination;

(ii)     Reference to the specific plan provisions on whichthe determination is based.

(iii)     A description of any additional material or information necessary for the claimant to perfect the claimand an explanation of why such material or information is

necessary;

(iv)    A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v)    In the case of an adverse benefit determination by a group health plan or a plan providing disability benefit,

(vi)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol,or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copyof such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

(vii)    If the adverse benefit determination is based on an exclusion or limit, either an explanation of the scientific orclinical judgment for the determination, applying the termsof the plan to the claimant's medical circumstances, or a statement that such

explanation will be provided free of charge upon

request.

(viii)   In the case of an adverse benefit determination by a group health plan

concerning a claim involving urgent care, a description of the expedited

review process applicable to such claims.

63.    Strict compliance with these requirements is necessary, and only *de minimis* errors may be excused. 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). The errors made here by the Plan were not *de minimis*.

64.    When each of the relevant claims was denied or underpaid, the Plan (or the TPA for the plan) generated claim adjudication details offering only vague and non-specific explanations for why the claims would not be properly paid. These explanations were not only vague, but at times, seemingly nonsensical.

65.    For example, in some cases the EOB's explained that certain claims would not be properly paid because the "Charge exceeds fee schedule," even though there was no fee schedule governing the claim(s) at issue. The Plan's EOBs also frequently included statements referencing a "legislated fee arrangement" when there was none.

66.    The plan's EOBs did not comply with ERISA regulations, including not stating the specific and/or actual reasons for its failure to pay claims in compliance with the express terms of an ERISA plan.  The Plan's EOBs also failed to provide details required by law or offer to provide more information if needed, as required by law.

67.    E.A. and Windmill assert that in many, if not as to all the claims of E.A. at issue in this case, the Plan required reimbursement for services received by E.A.

from Windmill to be reimbursed at its usual, customary and reasonable rates. Its failures to do so, has resulted in less coverage to E.A. than there should have been.

68.    E.A. and Windmill allege that the Plan breached applicable plan provisions, failed and refused to provide E.A. the full measure of coverage and benefits due under the terms of the Plan, resulting in damages to E.A. and in turn to Windmill.

69.    As a result of the Plan's actions and/or omissions, E.A. is entitled to recover under 29 U.S.C. § 1132(a)(1)(B) for the difference between the *de minimis* benefits tendered to Windmill for E.A.'s care and the coverage amounts that should have been provided, plus applicable pre and post judgment interest and reasonable attorneys' fees at the discretion of the Court.

70.    E.A. asserts that its actual damages in this action are in excess of $200,000.00 and can likely be more precisely calculated if and when E.A. and Windmill are able to secure relevant pre-trial discovery.

71.    E.A. seeks recovery of coverage and benefit amounts of not less than $214,164.00, or alternatively, in such amount as the Court determines to be accurate and appropriate. E.A. also seeks recovery of reasonable and necessary attorneys' fees, court costs, plus prejudgment and post-judgment interest at the highest legal rate on all sums awarded.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, E.A., (beneficiary of the H-E-B PPO Plan, requests that HEB, Inc. and the H-E-B PP Plan be summoned to appear and answer herein; and after hearing this cause on the merits, the Court enter judgment in favor of

E.A. and against the case defendants, jointly and severally, in the amounts determined by the Court as being appropriate as to each defendant, as well as collectively, the following relief :

A.      Judgment in favor of E.A. for actual damages of $214,164.00, or in the alternative, the amounts determined by the Court to be the correct sums for coverage of the medical services rendered to E.A. by Windmill based on Usual, Customary and Reasonable charges for medical services provided to persons receiving medical services of the nature provided to E.A. at the time and place rendered; and,

B.      All taxable costs of Court;

C.      Attorney's fees to be determined by the trier of fact;

D.      Pre and post judgment interest at the highest legal rate; and,

E.      Such other and further relief to which both plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

LAW OFFICES OF P. MATTHEW O'NEIL

By:     /s/ P. Matthew O'Neil
        P. MATTHEW O'NEILState
        Texas Bar No. 00795955
        6514 McNeil Dr.
        Bldg. 2, Suite 201
        Austin, Texas 78729
        (512) 473-2002 Telephone
        (512) 473-2034 Facsimile
        moneil@mattoneillaw.com

HOLLAWAY PC

By:    /s/  T. Daniel Hollaway
       T. Daniel Hollaway
       State Bar No.: 09866700
       19 Briar Hollow Lane, Suite 230
       Houston, Texas 77027-2820
       Telephone: (713) 942.7900
       Facsimile: (713) 942.8530

       ATTORNEYS FOR PLAINTIFFS