UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WINDMILL WELLNESS RANCH LLC AND E.A., | § | No. 5:23-CV-34-DAE |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| H-E-B, L.P. AND H-E-B HEALTHSHARE PPO PLAN, | § | |
| | § | |
| Defendants. | § | |

_____

<u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

      Before the Court is a Motion for Summary Judgment filed by Defendants H-E-B, LP ("HEB") and the H-E-B Healthshare PPO Plan (the "Plan") (collectively, "Defendants") on October 25, 2023. (Dkt. # 42.) Plaintiffs E.A. ("E.A.") and Windmill Wellness Ranch LLC ("Windmill") (together, "Plaintiffs") filed a Response in Opposition on November 16, 2023. (Dkt. # 45.) Defendants filed a Reply on November 29, 2023. (Dkt. # 46.)

      The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and against the motion, the Court **GRANTS** Defendants' Motion for Summary Judgment (Dkt. # 42) for the following reasons.

1

## FACTUAL BACKGROUND

Plaintiffs filed the instant suit against HEB on January 9, 2023, for failure to provide plan benefits under the federal Employee Retirement Income Security Act of 1974 ("ERISA").  (Dkt. # 1 at 32.)  Plaintiffs' amended complaint alleges that HEB furnishes health care benefits to its employees through the Plan. (Dkt. # 32 at 3–4.)  Plaintiffs claim that the Plan was established pursuant to ERISA, and that HEB serves as the sponsor, administrator, and fiduciary of the Plan.[1]  (Id.)  Plaintiffs sue HEB in each of these three capacities.

Windmill is an inpatient and outpatient treatment center specializing in substance abuse disorders, trauma therapies, and mental health services located in Canyon Lake, Texas.  (Id. at 2, 4.)  Windmill is not a contract provider under the Plan, meaning that services at Windmill are considered out-of-network for individuals covered under the Plan.  (Id. at 5.)  E.A., a Plan beneficiary, sought treatment at Windmill.  (Id.)  The basis of this suit is HEB and the Plan's alleged underpayment to Windmill for E.A.'s treatment.

---

[1] Plaintiffs allege that the third-party administrator of the Plan is Blue Cross Blue Shield of Texas ("BCBSTX").  (Dkt. # 32 at 5, 6.)  Plaintiffs state that under ERISA, the Plan Sponsor, or employer, is the Plan Administrator of a plan it establishes, meaning that the employer is directly responsible for Plan compliance and liable for compliance penalties, even if it has delegated the performance of these duties to another party, such as a Third-Party Administrator – which, in this case, is BCBSTX. (Id. at 3.)

Plaintiffs state that Windmill's customary business practice is to contact a plan or plan's third-party administrator prior to treating a prospective patient to confirm that the patient has out-of-network benefits available for the services being sought, the categories of medical services covered, and the extent of that coverage. (Dkt. # 32 at 6.) Windmill inquires specifically about the rates it will be paid for its services and asks the plan or third-party administrator whether it will pay its "Usual and Customary Rates" ("UCR") for out-of-network benefits and services. (Id. at 7.) Plaintiffs claim that if the Plan will not pay the UCR, Windmill requests a description of the benefits available under the health insurance policy to determine the method and measure of reimbursement it can expect to be paid. (Id.) Thus, when E.A. was admitted to Windmill, Windmill contacted BCBSTX for this information. (Id.)

Plaintiffs allege that BCBSTX represented to Windmill that the Plan would pay a percentage of E.A.'s Medicare rate, but responded that they "did not have that information" when asked what percentage of what rate. (Dkt. # 32 at 8.) Plaintiffs claim that there are no established Medicare rates for the level of care and types of services that are provided at Windmill, nor does Medicare provide a rate for an inpatient residential treatment center; however, Medicare does use service codes for substantially similar services. (Id.) Despite this, Plaintiffs contend that HEB and the Plan's reimbursement to Windmill was significantly less

than what would be due under Medicare's substantially similar codes and that, prior to filing suit in this case, neither HEB nor the Plan would disclose the method used for their reimbursement calculation.  (Id. at 9.)  According to Plaintiffs, E.A.'s treatment at Windmill amounted to $403,100.00.  (Id. at 15.)  To date, Plaintiffs claim they have received reimbursement of $70,110.69 – less than 17.5 percent of Windmill's charges.  (Id.)  Plaintiffs contend this amount is substantially less than the appropriate amount payable under the Plan, and that HEB's refusal to pay has improperly shifted a disproportionate amount of the debt to E.A.  (Id.)

PROCEDURAL BACKGROUND

Defendants moved to dismiss Plaintiffs' original complaint, challenging Windmill's standing to sue the Plan under ERISA and the general plausibility of Plaintiffs' ERISA claims.  (Dkt. # 14.)  On April 21, 2023, the Court denied the motion, finding that Windmill has derivative standing to bring a cause of action against Defendants under ERISA based on an assignment of rights signed by E.A. upon admission to Windmill.  (Dkt. # 25.)  The Court also determined that Plaintiffs pled a plausible cause of action under ERISA as the Plan provides for an "Allowable Amount" generally based on a Medicare percentage, and Plaintiffs dispute Defendants' interpretation of this Plan term.  (Id.)

On July 18, 2023, Plaintiffs filed an amended complaint in order to correct the name of Defendants and to correct the amounts allegedly charged for E.A.'s services and the reimbursed amount paid to date by Defendants.  (Dkt. # 32.)  The amended complaint again alleges only one single cause of action to recover ERISA benefits under Section 502(a)(1)(B).  (Id.)

Defendants have now moved for summary judgment and the motion is fully ripe for disposition.  (Dkts. ## 42, 45, 46.)

## LEGAL STANDARD

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335 (5th Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. Infante v. Law Office of Joseph Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v.

6

<u>Hillstone Rest. Grp., Inc.</u>, 864 F.3d 354, 357 (5th Cir. 2017) (quoting <u>Boudreaux v.</u>
<u>Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005)).  In deciding a summary
judgment motion, the court draws all reasonable inferences in the light most
favorable to the nonmoving party.  <u>Wease v. Ocwen Loan Servicing, LLC</u>, 915 F.3d
987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be
authenticated or otherwise presented in an admissible form.  <u>See</u> Fed. R. Civ. P.
56(c); <u>Lee v. Offshore Logistical & Transp., LLC</u>, 859 F.3d 353, 355 (5th Cir.
2017).  However, "[u]nsubstantiated assertions, improbable inferences, and
unsupported speculation are not sufficient to defeat a motion for summary
judgment." <u>United States v. Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012)
(quoting <u>Brown v. City of Houston</u>, 337 F.3d 539, 541 (5th Cir. 2003)).

<u>DISCUSSION</u>

Defendants move for summary judgment on Plaintiffs' sole ERISA
claim against them on the basis that: (1) Plaintiffs have failed to exhaust their
administrative remedies as required by ERISA for most of the 104 claims they
submitted for payment under the Plan; (2) as to the 23 remaining claims for which
they properly exhausted their administrative remedies, Plaintiffs argued to
BCBSTX only that the Plan should utilize their preferred reimbursement
methodology rather than the methodology provided in the Plan; and (3) BCBSTX

did not abuse its discretion by interpreting the Plan and applying a standard methodology to calculate reimbursement benefits, which were then paid as required by the Plan.  (Dkt. # 42.)

I.      Exhaustion of Administrative Remedies

Defendants first argue that Plaintiffs have failed to exhaust the administrative remedies associated with the majority of their claims.  (Dkt. # 42 at 13.)  Because Plaintiffs appear to seek relief as to all 104 of their claims associated with services provided to E.A., but have not appealed the majority of these claims, Defendants argue the Court can only consider the 23 claims which were in fact appealed and thus administratively exhausted.  (Id.)

In response, Plaintiffs argue that E.A. was admitted for a "single continuous admission and the billing submitted by Windmill does not constitute multiple different claims."  (Dkt. # 45 at 17.)  Thus, according to Plaintiffs, it is customary for facility fees to billed on a "line item" basis which all constitute one claim for a single patient admission.  (Id.)

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).  Under 29 U.S.C. § 1133(2), every ERISA plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the

decision denying the claim." Before a claimant may sue to receive benefits from an ERISA plan, the claimant "must first exhaust available administrative remedies under the plan." Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps., 215 F.3d 475, 479 (5th Cir. 2000). Because the exhaustion requirement is an affirmative defense, the defendant has the burden of proof. Mission Toxicology, LLC v. UnitedHealthcare Ins., 499 F. Supp. 3d 338, 347 (W.D. Tex. 2020). After the defendant carries its burden, the plaintiff has the burden to show an applicable exception. Id.

Here, Plaintiffs cite no case law or other authority in support of their contention that the 104 claims submitted should be considered one single claim for purposes of this case. (See Dkt. # 45 at 17; Dkt. # 45-2.) Plaintiffs further fail to explain how submitting the 104 claims as one large claim comports with ERISA law, triggering the 90-day claim review period and the 180-day appeals period pursuant to 29 C.F.R. §§ 2560.503-1(e), (f)(1), h(3)(i), (i)(1)(i). And, even if the Court were to accept Plaintiffs' theory that the 104 claims comprise one single claim, they have not demonstrated that they have exhausted their administrative remedies for all parts of this claim. Accordingly, the Court will grant summary judgment to Defendants as to Plaintiffs' 81 claims for which Plaintiffs failed to exhaust their administrative remedies. (See Dkt. # 42-1 at lines 1–34, 37–40, 43, 45, 51–63, 66–71, 73–90, 92, 100, 102, 104.)

II.    <u>New Arguments</u>

Defendants next argue that Plaintiffs are precluded from raising new arguments in this case that they did not advance during the administrative appeals process.  (Dkt. # 42 at 13.)  Defendants maintain that of the 23 remaining claims for which they exhausted administrative remedies, Plaintiffs' arguments to BCBSTX were limited to requesting an alternative reimbursement methodology to that provided under the Plan.  (<u>Id.</u> at 14.)  Defendants contend that Plaintiffs requested methodology that they considered a "fair" or "reasonable" rate consistent with "industry standards" and the Fair Health guidelines but did not challenge the meaning and calculation of "Allowable Amount" as they do here.  (<u>Id.</u>)  Defendants argue that Plaintiffs are therefore limited in pursuing this argument.  (<u>Id.</u>)

Plaintiffs do not directly respond to this argument; instead, Plaintiffs assert that they were not provided with documentation prior to this lawsuit which shows how the Plan reimbursed Windmill at the rates stated within the applicable plan documents.  (Dkt. # 45 at 3, 5.)  Plaintiffs argue that "by being denied access to the plan documents, the ability to submit effective administrative appeals is severely compromised" and thus contend that they were not able to properly challenge the Plan in the appeal to BCBSTX.  (<u>Id.</u>)  Additionally, Plaintiffs assert that the Plan's Summary Plan Descriptions ("SPDs") do not adequately satisfy

ERISA regulations because Windmill was unable to estimate the payments they

received.  (Dkt. # 45 at 9.)  Plaintiffs contend that the Plan's provisions are "vague

and meaningless" as to the out-of-network benefits that will be paid to facilities

such as Windmill.  (Id. at 10.)  Plaintiffs further assert that Defendants were

required to issue Explanation of Benefits ("EOBs") in conformance with

regulations but there is no language in the Plan documents which states a "tangible

standard for determining the amount that the plan will pay."  (Id.)

      A.    <u>Summary Plan Description</u>

      Under ERISA § 102(a), SPDs must be "written in a manner calculated

to be understood by the average plan participant" and must be "sufficiently

accurate and comprehensive to reasonably apprise such participants and

beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

As such, courts interpret plan summaries from the perspective of a layperson.

<u>Koehler v. Aetna Health Inc.</u>, 683 F.3d 182, 188 (5th Cir. 2012); <u>Harris Methodist

Ft. Worth v. Sales Support Servs. Inc. Emp. Health Care Plan</u>, 426 F.3d 330, 336

(5th Cir. 2005).

      Section 102(a) sets forth a comprehensive list of information that a

SPD must contain, including "circumstances which may result in disqualification,

ineligibility, or denial or loss of benefits."  29 U.S.C. § 1022(b).  One key

regulation notes that plan summaries "must not have the effect to misleading,

misinforming or failing to inform participants and beneficiaries" and that "[a]ny description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant."  29 C.F.R. § 2520.102-2(b).  Instead, "[s]uch exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized" in a similar manner to other plan benefits.  Id.  When crafting SPDs, plan administrators are to "tak[e] into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan," and should "usually" limit "technical jargon" and use "clarifying examples and illustrations."  Id. at § 2520.102-2(a).

The Court disagrees with Plaintiffs' contention regarding the SPD. First, Plaintiffs fail to specify which part of the more than 160-page SPD they take issue with, leaving the Court to wade through the SPD itself.  (See Dkt. # 43-1.) Second, although as stated above, plan summaries are required to be "written in a manner calculated to be understood by the average plan participant, and . . . [must be] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," 29 U.S.C. § 1022(a), the Supreme Court has clarified, however, that "statements in a summary plan description 'communicat[e] with beneficiaries about the plan,

but . . . do not themselves constitute the terms of the plan.'" <u>US Airways, Inc. v.</u>

<u>McCutchen</u>, 569 U.S. 88, 92 n.1 (2013) (alteration in original) (quoting <u>CIGNA</u>

<u>Corp. v. Amara</u>, 563 U.S. 421 (2013)).  Finally, Plaintiffs cite no regulation which

requires SPDs to lay out estimates of benefits for out-of-network, in-patient

treatment facilities such as Windmill.  Instead, upon the Court's careful review of

both the 2019 and 2022 SPD in evidence in this case, the Court finds that the SPDs

sufficiently detail the rights and obligations of Plan participants and beneficiaries,

warning them that participants will receive fewer benefits for out-of-network

providers, including that "[i]f you go outside the Network for care, the H-E-B

HealthShare Plan will only pay a portion of the cost for covered services, and

you'll pay much more than if you stay in the Network."  (<u>See, e.g.</u>, Dkt. # 43-1 at

221.)

      B.   <u>Explanation of Benefits</u>

      Under section 1133, every employee benefit plan must: "(1) provide

adequate notice in writing to any participant or beneficiary whose claim for

benefits under the plan has been denied, setting forth the specific reasons for such

denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has

been denied for a full and fair review by the appropriate named fiduciary of the

decision denying the claim."  29 U.S.C. § 1133.

Regarding the notice requirement, the Department of Labor Regulations further require that an ERISA claim denial be set forth in a manner that can be understood by the claimant and include: "(i) [t]he specific reason or reasons for the adverse determination, (ii) [r]eference to the specific plan provisions on which the decision is based, (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503–1(g). The Fifth Circuit has interpreted ERISA's notice procedures as requiring the administrator to not only disclose the specific ground or grounds for the initial denial of a claim for benefits, but also to limit subsequent review to those specific grounds. See Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 393 (5th Cir. 2006). Disclosure of the specific basis for the administrator's decision "is necessary so that beneficiaries can adequately prepare for any further administrative review" and "ensures the 'meaningful review' contemplated by subsection (2) [of § 1133]." Id. (quoting Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 394 (5th Cir. 1998)).

Regarding the EOBs in this case, Plaintiffs contend that they fail to state any tangible standard for determining the amount the plan will pay for any item, service or supply that can be billed using industry standard billing and coding conventions. (Dkt. # 45 at 10, 13.) Plaintiffs maintain that when each of the

relevant claims were denied or underpaid, the EOBs generated claim detail "offering only vague and non-specific explanations … for why the claim was adjudicated in the manner stated on the EOB."  (Id. at 13–14.)

In response, Defendants contend that the EOBs substantially complied with the regulations and contain all the enumerated information cited above.  (Dkt. # 46 at 9.)  Defendants cite the initial EOBs associated with Claim 2062500N3390X, which notify E.A. that the claim was denied, how to contact BCBSTX with questions, access the Plan and claim details, and appeal the denial. (Id. (citing Administrative Record ("AR") at 895–900).)  Defendants further argue that Plaintiffs successfully appealed the original claim denials, demonstrating that the EOBs sufficiently explained the process in accordance with the regulations. (Id. at 9–10 (citing AR at 902–03, 1507–12).)

The Court agrees with Defendants' contentions.  The EOBs in evidence[2] comply with § 1133 and the notice requirements pursuant to § 2560.503–1(g).  The EOBs describe the reason for the claim's denial and describe the method for appealing such denial.  (See, e.g., AR at 895–900.)  And, even if there is some minor procedural violation pertaining to the notice provisions, it is

---

[2] Plaintiffs cite as evidence what appears to be a portion of a Provider Claim Summary associated with Claim 2062500N3390X, which is not part of the Administrative Record, but do not actually cite to an EOB to support their argument. (See Dkt. # 45-3.)  Nevertheless, the Court reviewed the EOBs produced in the administrative record in this case.

clear that Plaintiffs were able to successfully lodge appeals to certain claim denials, which in some cases resulted in adjustment of BCBSTX's claim payments. (See, e.g., at 902–03, 1507–12.)

Indeed, "[c]hallenges to ERISA procedures are evaluated under the substantial compliance standard." Pilihos v. Energy Transfer Partners G.P.L.P. Health and Welfare Program, No. 5:19–CV–890–DAE, 2020 WL 13430524, at *9 (W.D. Tex. Oct. 28, 2020) (citing Cooper v. Hewlett-Packard Co., 592 F.3d 645, 652 (5th Cir. 2009); Lafleur v. La. Health Serv. & Indem. Co., 563 F.3d 148, 153–54 (5th Cir. 2009)). This means that "'[t]echnical noncompliance' with ERISA procedures 'will be excused' so long as the purposes of section 1133 have been fulfilled." Robinson, 443 F.3d at 393 (quoting White v. Aetna Life Ins. Co., 210 F.3d 412, 414 (D.C. Cir. 2000)). The purpose of section 1133 is "to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." Lafleur, 563 F.3d at 154. Notably, "[t]he 'substantial compliance' test also 'considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." Id. (quoting Moore v. LaFayette Life Ins. Co., 458 F.3d 416, 436 (6th Cir. 2006)).

Upon careful review, the Court finds that Defendants substantially complied with ERISA procedures and will reject Plaintiffs' arguments regarding

the EOBs in this case. And now, assuming without deciding that Plaintiffs can properly challenge the meaning and calculation of "Allowable Amount" although it was not explicitly raised in their appeal to BCBSTX, the Court will consider it next.

III.    Plaintiffs' ERISA Claim

Defendants move for summary judgment on Plaintiffs' ERISA claim on the basis that BCBSTX did not abuse its discretion when it calculated the "Allowable Amount" paid to Windmill using the "Seventy-Five Percent Methodology." (Dkt. # 42 at 16.) In response, Plaintiffs argue that Defendants have failed to establish that the benefits payments to E.A. are rationally connected to the facts and evidence. (Dkt. # 45 at 8.) Plaintiffs further assert that Defendants have not provided sufficient evidence regarding the payments made and how that amount was determined until "well after the litigation was filed and Plaintiffs [now] dispute the veracity of the alleged basis for the amount paid for the services provided to" E.A." (Id.)

A.    Standard of Review

Title 29 U.S.C. § 1132(a)(1)(B) of ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008); see also 29 U.S.C.

§ 1132(a)(1)(B); Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 394 (5th Cir. 1998). To maintain a claim under § 1132(a)(1)(B), "the claimant must show that he or she 'qualif[ies] for the benefits provided in that plan.'" Singletary v. United Parcel Serv., Inc., 828 F.3d 342, 348 (5th Cir. 2016) (quoting Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 583 (2d Cir. 2006)). In interpreting an ERISA plan, the Fifth Circuit gives "its language the ordinary and generally accepted meaning." Koehler v. Aetna Health, Inc., 683 F.3d 182, 187 (5th Cir. 2012).

Plan claims administrators make two decisions when deciding whether to pay benefits: "(1) finding the facts underlying the claim and (2) determining 'whether those facts constitute a claim to be honored under the terms of the plan.'" Firman v. Life Ins. Co. of N. Am., 684 F.3d 533, 538 (5th Cir. 2015) (per curiam) (quoting Schadler, 147 F.3d at 394). For both decisions, the court applies a de novo standard of review, unless the ERISA plan delegates discretionary authority to the plan administrator. Ariana M. v. Humana Health Plan of Tex., Inc., 884 F.3d 246, 247, 255–56 (5th Cir. 2018) (en banc); see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the plan confers discretionary authority on the plan administrator itself, the court reviews the exercise of the authority for abuse of discretion. Ariana M., 884 F.3d at 247.

Here, Defendants have provided evidence that the Plan vests the Plan Administrator or its delegate, BCBSTX, with discretionary authority to determine eligibility for benefits and construe the terms of the Plan.  (AR at 338.)   In such a case, the Court may reverse the denial of benefits only if BCBSTX abused its discretion.[3]  Ariana M., 884 F.3d at 247.

In the ERISA context, "[a]buse of discretion review is synonymous with arbitrary and capricious review."  Cooper v. Hewlett-Packard Co., 592 F.3d 645, 652 (5th Cir. 2009).  "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial."  McCorkle v. Metro. Life Ins. Co., 757 F.3d 452, 457 (5th Cir. 2014).  "Similarly, a decision constitutes an abuse of discretion 'only if it is made without a rational connection between the known facts and the decision or between the found facts and the decision.'"  George v. Reliance Standard Life Ins. Co., 776 F.3d 349, 353 (5th Cir. 2015) (quoting Truitt v. Unum Life Ins. Co. of Am., 729 F.3d 497, 508 (5th Cir. 2013)).

---

[3] Plaintiffs contend that the Court should apply the de novo standard of review, and not an abuse of discretion standard in considering the claims in this case.  (Dkt. # 45 at 7.)   However, as stated above, "[w]hen an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion."  Ariana M., 884 F.3d at 247; see also Krishna v. Life Ins. Co. of North Am., No. 22-20516, 2023 WL 4676822, at *4 (5th Cir. July 21, 2023).  A de novo review would apply in cases in which a plan does not validly delegate fiduciary discretion.  Id.

"When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, [courts] affirm an administrator's decision if it is supported by substantial evidence." Cooper, 592 F.3d at 652 (quoting Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir. 1999)). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2004) (quoting Deters v. Sec'y of Health, Educ. & Welfare, 789 F.2d 1181, 1185 (5th Cir. 1986)).

"An ERISA claimant bears the burden to show that the administrator abused its discretion." George, 776 F.3d at 352–53; see also Ellis, 394 F.3d at 273 ("The law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence . . . exists to support the employee's claim."). Thus, as the ERISA claimants, Plaintiffs have "the initial burden of demonstrating . . . that [the] denial of benefits under [the] ERISA plan [was] arbitrary and capricious." Anderson v. Cytec Indus., Inc., 619 F.3d 505, 512–13 (5th Cir. 2010) (quoting Perdue v. Burger King Corp., 7 F.3d 1251, 1254 n.9 (5th Cir. 1993)).

Under an abuse of discretion standard, the district court's review of the plan administrator's determinations is limited to the administrative record, with certain limited exceptions related to plan interpretation.  See LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs, Inc., 703 F.3d 835, 841 (5th Cir. 2013); Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, 215 F.3d 516, 521 (5th Cir. 2000); Meditrust, 168 F.3d at 215.  Further, courts may "consider only the actual basis on which the administrator denied the claim"; courts may not consider "post-hoc rationalization[s]."  Koehler, 683 F.3d at 190 n.18 (5th Cir. 2012) (quoting Robinson, 443 F.3d at 395–96 n.4).

  B.  Did BCBSTX Abuse its Discretion?

The Plan at issue contained the following provisions regarding out-of-network providers such as Windmill:

**Out-of-Network**

If you go outside the Network for care, the H-E-B HealthShare Plan will only pay a portion of the cost for covered services, and you'll pay much more than if you stay in the Network. The only exception is for specialized care not available through the Blue Choice Network, or certain services subject to surprise billing protection as discussed below.

Out-of-network benefits are paid based on the Plan's Allowable Amount. The "Allowable Amount" is the maximum amount that the Plan will consider paying for a particular service, supply, or procedure. It is determined by Blue Cross and Blue Shield of Texas, the Claim Administrator. In addition to your share of the cost, your out-of-network Provider can and will hold you responsible for any balance above the Allowable Amount. Charges in excess of the Allowable Amount, as determined by the Claim Administrator, are not covered under the Plan, and do not apply to your out-of-pocket maximums.  An exception to this general rule is when you get emergency services at an out of network facility or independent free standing emergency facility or are treated by an out-of-network ancillary provider at an in-network hospital or ambulatory surgical

center (see surprise medical bills section below). If you get other non-emergency services from out-of-network providers at in-network facilities, they can't balance bill you, unless you give written consent and give up your protections. This exception is not applicable to 'ancillary services' or services arising from unforeseen, urgent medical needs.

(AR at 221–22.)  Regarding the "Allowable Amount," the Plan states:

The Allowable Amount is generally based on a percentage of the Medicare reimbursement rate, or with respect to services protected by surprise billing laws, the Qualifying Payment Amount. For services that are not protected by surprise billing laws, you are responsible for charges not paid by the Plan, which may be substantial. For example, if a non-network doctor bills $10,000 for a covered service and the Blue Cross & Blue Shield of Texas Allowable Amount is $4,000, assuming your Deductible is met, you would pay $6,800 ($4,000 x 20% Pre-authorized Network Coinsurance = $800 plus the $6,000 exceeding the Allowable Amount).

(AR at 223.)

Defendants contend that although the "Allowable Amount" is "*generally* based on a percentage of the Medicare reimbursement rate," as stated above, Medicare rates are not available for every treatment and service covered under the Plan, such as Windmill's services to E.A. in this case. (Dkt. # 42 at 9–10 (emphasis in original).) Therefore, Defendants maintain that BCBSTX cannot always use Medicare rates to determine the "Allowable Amount" for out-of-network services. (Id. at 10.) In such case, as here, BCBSTX determines Plan benefits, or the amount of reimbursement for out-of-network providers, by applying "a standard methodology equivalent to 75% of the average rate for in-network providers for the types of services at issue." (Id.) This is known as the "Seventy-Five Percent Methodology." (Id.) Defendants state that because there was no Medicare rate in this case, BCBSTX applied the Seventy-Five Percent Methodology to determine and pay the "Allowable Amount" in E.A.'s case. (Id.)

"When reviewing the administrator's second decision—interpretation and application of the plan language—for an abuse of discretion, the Fifth Circuit applies a two-step inquiry." Firman, 684 F.3d at 539 (citing Stone v. UNOCAL

22

Termination Allowance Plan, 570 F.3d 252, 257 (5th Cir. 2009)).  First, the court analyzes whether the determination was legally correct.  Id.  Then, if not legally correct, the court proceeds to decide whether the determination was an abuse of discretion.  Id.

"To determine if the administrator's decision is legally correct, the court considers: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan. . . .  The factor most worth considering is whether the administrator's interpretation is consistent with a fair reading of the plan."  Porter v. Lowe's Companies, Incorporated's Business Travel Accident Insurance Plan, 731 F.3d 360, 364 n.8 (5th Cir. 2013) (internal quotations and citations omitted).

### 1.    Uniform Construction

Regarding the first factor—uniform construction—Plaintiffs contend that BCBSTX did not consistently use the Seventy-Five Percent Methodology in this case.  (Dkt. # 45 at 16.)  In support, Plaintiffs submit a chart which purports to show "gross inconsistency in the reimbursement rates used," based on "the same line items and charges being paid at very different payment rates."  (Id. (citing Dkt. # 45-2).)  Plaintiffs' chart, however, created by a Windmill employee, fails to identify which charges are being compared.  Furthermore, the chart fails to direct

23

the Court to the corresponding evidence, including page numbers and lines, in the administrative record in this case.  The Court is also unable to glean from this chart which of these claims were administratively exhausted and thus properly before the Court.  Plaintiffs do not direct the Court to any other evidence in support.

On the other hand, the administrative record shows that the Plan required out-of-network providers to be paid based on the "Allowable Amount," which is "*generally* based on a percentage of the Medicare reimbursement rate." (AR at 221.)  However, because there is no Medicare reimbursement rate for the types of services E.A. received at Windmill, BCBSTX calculates the "Allowable Amount" as seventy-five percent of the average rate for in-network providers which it uses in instances which lack a Medicare rate (AR at 2822).  See, e.g., Hous. Home Dialysis, LP v. Blue Cross & Blue Shield of Tex., a Div. of Health Serv. Corp., Civil Action No. H–17–2095, 2018 WL 2562692, at *1 (applying Seventy-Five Percent Methodology in home dialysis context where no Medicare rate exists).  Based on the foregoing, the Court finds Plaintiffs have failed to submit competent summary judgment evidence that BCBSTX failed to give the Plan uniform construction in this case.

## 2.    Fair Reading

Regarding the second factor, the most important factor—whether BCBSTX gave the Plan a fair reading—Defendants point the Court to the

24

administrative record wherein the Plan grants BCBSTX "complete discretion to interpret and construe the provisions of the Plan, make findings of fact, correct errors and supply omissions." (AR at 338.) Because there is no Medicare rate for the services provided in this case, Defendants contend that BCBSTX exercised its discretion to interpret the Plan and supply the omission regarding the "Allowable Amount" for services where no Medicare rate exists. (Dkt. # 42 at 18; AR at 2822.) Defendants further assert that BCBSTX exercised its discretion by reasonably taking a percentage of the average rate for in-network providers instead of the Medicare rate, hewing closely to the Plan definition of "Allowable Amount." (Dkt. # 42 at 18.)

In response, Plaintiffs do not directly respond to Defendants' contention regarding BCBSTX's discretion to interpret the Plan. Instead, Plaintiffs contend that Defendants' declaration which purports to explain BCBSTX's chosen methodology in this case was only recently produced to Plaintiffs, but was never explained in the EOBs, payment remittances, appeals denial or in any way prior to Windmill's filing suit in this case. (Dkt. # 45 at 15–16.) Therefore, Plaintiffs argue that an "after the fact declaration does not serve as [a] basis for how the payment rates for the admission of E.A. were determined or its duties to properly adjudicate claims under the plan and in accordance with ERISA." (Id. at 16.)

Regardless of whether the standard of review is abuse of discretion or de novo, a district court's review of an ERISA benefits determination under Section 502(a)(1)(B) is limited to the administrative record.  Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 215 F.3d 516, 521 (5th Cir. 2000) (citation omitted).  "Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim."  Id.  "Thus, evidence related to how an administrator has interpreted terms of the plan in other instances is admissible."  Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999).

Because the declaration at issue: (1) relates to how BCBSTX interpreted the terms of the Plan in other instances, and (2) assists the Court in understanding a practice related to a claim, especially wherein the declaration states "BCBSTX applies this methodology consistently where, as here, there is not an available Medicare rate," the Court finds that the declaration is properly in evidence before this Court, and will overrule any objections to it.  (Dkt. # 45-4 at 2.)  Furthermore, Plaintiffs' timing argument is unavailing since there is no evidence that Windmill ever sought this information pertaining to how BCBSTX

26

interpreted the Plan prior to the litigation in this case.  See 29 U.S.C. § 2560.503-1(h)(2)(iii) ("[A] claimant shall be provided, upon *request* and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.") (emphasis added); Jaremko v. Erisa Admin. Comm., No. 10–1137–RDR, 2012 WL 2120009, at *4 (D. Kan. June 11, 2012).

Upon careful consideration of the administrative record and the declaration in evidence in this case, the Court finds that BCBSTX engaged in a fair reading of the Plan and properly exercised its "complete discretion" to interpret the Plan by reasonably taking a percentage of the average rate for in-network providers, rather than a percentage of the Medicare rate, given that no Medicare rate was available for the services E.A. received at Windmill.

### 3.    Unanticipated Costs

Regarding the third factor—unanticipated costs resulting from different interpretations of the Plan—Defendants contend the Seventy-Five Percent Methodology ensures consistency and predictability to all out-of-network providers who provide the same services especially where no Medicare rate exists. (Dkt. # 42 at 18.)  In response, Plaintiffs argue that in cases where Plan beneficiaries elect to receive out-of-network services, the methodology used by BCBSTX is "unfair to ERISA plan participants and beneficiaries, resulting in

greater personal costs to the member, in this case the patient E.A." (Dkt. # 45 at 15.) However, Plaintiffs have pointed to no evidence in the administrative record which evidences any unanticipated costs resulting from different interpretations of the Plan. Defendants, on the other hand, offer evidence which demonstrates that BCBSTX offered to find E.A. an in-network provider which was declined. (AR at 2802–04.) Although E.A. turned down the offer, the record shows she received notice that choosing an out-of-network provider would result in fewer Plan benefits, including that Windmill could "bill [E.A.] the full amount," and that "the patient may be responsible for any amount over the allowed amount because [Windmill is] not contracted" with BCBSTX. (Id.) Thus, Plaintiffs have failed to produce sufficient summary judgment evidence that there are any unanticipated costs resulting from different interpretations of the Plan.

After resolving each of the relevant factors in favor of Defendants, the Court finds that BCBSTX gave a legally correct interpretation of the Plan provisions in question. This finding pretermits "any need to consider whether a legally incorrect interpretation of the [Plan] was not an abuse of discretion."[4]

---

[4] Even if the Court assumes, for the sake of argument, that BCBSTX's decision was legally incorrect, the Court would not hold that it abused its discretion. Here, BCBSTX's decision to employ the Seventy-Five Percent Methodology "fall[s] somewhere on a continuum of reasonableness," given that the Plan does not specify the "Allowable Amount" in situations without a Medicare rate. Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C., 878 F.3d 478, 483 (5th Cir. 2017). And, as

<u>Ellis v. Liberty Life Assurance Co.</u>, 394 F.3d 262, 270 (5th Cir. 2004).

Accordingly, because BCBSTX did not abuse its discretion, the Court will grant summary judgment in favor of Defendants.

<u>CONCLUSION</u>

For the reasons stated in this Order, the Court **GRANTS** Defendants' Motion for Summary Judgment, and Plaintiffs' claims are hereby **DISMISSED WITH PREJUDICE**.  The Clerk's Office is **INSTRUCTED** to **ENTER JUDGMENT** and **CLOSE THE CASE**.  The Court will entertain a timely filed motion for attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1).

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, August 22, 2024.

_____

David Alan Ezra
Senior United States District Judge

---

discussed above, the Plan grants BCBSTX "complete discretion to interpret . . . and supply omissions."  (AR at 338.)